**Anthony BOYLE and Maureen**
**Boyle, h/w, Respondents.**

v.

**INDEPENDENT LIFT TRUCK,**
**INC. and Frank Fatiga, Jr.,**
**Petitioners.**

Supreme Court of Pennsylvania.

Dec. 31, 2009.

### ORDER

PER CURIAM.

**AND NOW,** this 31st day of December, 2009, the Petition for Allowance of Appeal is **GRANTED.** The issue, rephrased for clarity, is:

> Did the Superior Court err in ordering a new trial due to an allegedly improper verdict slip question on comparative negligence, where the jury never reached the issue of comparative negligence?

■

**John SZYMANOWSKI and Michael**
**A. Wheeling, individually and on**
**behalf of BSW, Appellants**

v.

**Robert H. BRACE and BCD**
**Properties, Inc.,**
**Appellees.**

Superior Court of Pennsylvania.

Argued Aug. 26, 2009.

Filed Nov. 13, 2009.

Reargument Denied Jan. 28, 2010.

W. Patrick Delaney, Erie, for appellants.

Richard A. Lanzillo, Erie, for appellee.

BEFORE: BENDER, BOWES and CLELAND, JJ.

OPINION BY CLELAND, J:

¶ 1 Appellants John Szymanowski and Michael A. Wheeling (Szymanowski/Wheeling) appeal the trial court's order granting summary judgment in favor of Appellees Robert H. Brace (Brace) and BCD Properties, Inc. (BCD). The parties formed a partnership known as BSW to drill two gas wells in Erie County on leaseholds previously acquired by and still titled to Brace. The parties dispute whether their partnership encompasses two later developed gas wells *not mentioned* in their partnership agreement but drilled on the same leasehold titled to Brace and on which one of the partnership's own wells was located. For reasons that follow, we affirm.

¶ 2 As we undertake our analysis, we remind ourselves the judicial construction of instruments involving oil and gas is particularly troublesome. Pennsylvania case law evidences a long and tortured trail of attempts to make sense of phrases, parts of phrases, and words of art sometimes used in a common sense manner and sometimes used with a precise technical meaning, and all used in documents sometimes drafted with care and sometimes quickly scribbled by the litigants themselves. Many oil and gas titles trace to agreements from the late 19th or early 20th century and may use antiquated terms foreign to us today. A century ago, a farmer's understanding of how the surface of his land would be used to extract the oil and gas lying beneath it would be considerably different from the understanding of the surface owner today who is acutely aware of the increased burdens on the surface imposed by modern extraction technology. *See McGavitt v. Guttman Re-*

*alty Company,* 909 A.2d 1 (Pa.Super.2006); *Jacobs v. CNG Transmission Corp.,* 332 F.Supp.2d 759 (W.D.Pa.2004).

¶ 3 The legal effect of words clearly understood when used in other contexts, therefore, becomes murky when considered in the context of oil and gas instruments. The fact, for example, that an instrument is titled a "lease," "deed," or "agreement" is not determinative. Even the use of the words "grant and convey" does not necessarily create a fee simple estate in the grantee. *See Pennsylvania Bank and Trust Company, Youngsville Branch v. Dickey,* 232 Pa.Super. 224, 335 A.2d 483 (1975). Applying the literal meaning to words and phrases found in oil and gas documents is fraught with the opportunity for injustice.

¶ 4 As a result, we must be mindful that the object in interpreting instruments relating to oil and gas interests, like any written instrument, "is to ascertain and effectuate the intention of the parties." *Hess v. Jones,* 335 Pa. 569, 7 A.2d 299 (1939). *Stewart v. Chernicky,* 439 Pa. 43, 266 A.2d 259 (1970).

¶ 5 With these principles in mind, we turn now to the case before us. One of the two partnership wells, Danylko # 1 on the Danylko lease, had a brief but spectacular lifetime.[1] In its 28 months' existence it generated $454,913.80 for Szymanowski/Wheeling on the 20% net profit interest they acquired for a $30,000 investment. It ceased production in February 2005. In early 2004, Brace, for his own account,

completed Danylko # 2 and Danylko # 4 wells which remain successful producers.

¶ 6 In 2005, Szymanowski/Wheeling, individually and on behalf of BSW, brought this breach of contract and breach of fiduciary duty action against Brace and BCD. In July 2007, Brace and BCD filed a motion for partial summary judgment. On October 8, 2007, the trial court granted the motion. On October 15, 2008, because the parties entered into a stipulation dismissing all claims and counterclaims except Szymanowski/Wheeling's claim to the Danylko lease and Danylko # 2 and Danylko # 4 wells, the trial court entered an order rendering its October 8 order as final and determining "no further matters need to be heard by this court."[2] The parties' further stipulated that BSW was a partnership, not a different business entity, but "without prejudice to any party's positions or arguments on all other issues." Stipulation, 10/09/08, at ¶ 2. On October 15, 2008, Szymanowski/Wheeling timely appealed.

¶ 7 Brace has been in the oil and gas business for years, having acquired various leases in Erie County and, through BCD, a natural gas gathering or pipeline system to move the gas to third party purchasers. Robert Brace Deposition, 12/4/06, at 33–44. On September 27, 2000, he acquired the Danylko lease on 150 acres and began drilling Danylko # 1 on or about October 1, 2002.[3] Amended Complaint, Exhibit A; Wheeling Deposition, 7/20/06, at 59–60. On October 1, 2002, approximately three days before completing the well, BCD and Szymanowski/Wheeling entered into a Gas

---

1. The other well, Dougherty # 1, is on the Dougherty lease and has returned a modest $7,843.32 on Szymanowski/Wheeling's $30,000 investment.

2. The October 15 order refers to the October 8 order as the October 9 order, presumably because it was filed on October 9.

3. Brace acquired the Dougherty lease on February 5, 2001. Amended Complaint, Exhibit B.

Well Agreement that is the substance of their partnership agreement.[4] Amended Complaint, Exhibit C.

¶ 8 The Gas Well Agreement is a one-page agreement providing:

BCD Properties, Inc. (owner Robert H. Brace) and Michael A. Wheeling and John Szymanowski have entered into an agreement on this 1st day of October, 2002, involving two new gas wells being drilled. The two new gas wells, Dougherty # 1, and Danylko # 1 are located in McKean Twp. Each of the two parties entering this agreement with BCD Properties, Michael A. Wheeling and John Szymanowski, have agreed to purchase into a portion of the wells at $15,000.00 per well, each, making a total of $30,000.00 received from each contributor. This amount will be due BCD Properties at the signing of this contract. This total will account for 10% from each contributor per well. Each contributor will then receive 10% net profit after royalties, well tending fees, and operating expenses are deducted from the wells production each month.

*Id.*

¶ 9 The Gas Well Agreement did not make any express or implied reference to any other oil and gas ventures, on the Danylko or Dougherty leases or elsewhere, or any other kind of undertaking. The parties did discuss the possibility of additional gas well projects or ventures but no commitments of any kind were made. Wheeling Deposition, 7/20/06, at 52, 61–62; Szymanowski Deposition, 7/20/06, at 11, 17. The parties did not discuss any assignment of the Danylko or Dougherty leases. *Id.* at 33.

¶ 10 Danylko # 1 production peaked in October 2003 and began a steady decline thereafter until it ceased and the well was disconnected in February 2005. Wheeling Deposition, 7/20/06, at 91–92 and Exhibit 47. In April 2004, BCD drilled the two additional wells, Danylko # 2 and Danylko # 4, each on the same Danylko leasehold and approximately 1,100 to 1,200 feet from Danylko # 1, and each modestly successful. Randall J. Brace Deposition, 7/21/06, at 91, 95–96.

¶ 11 Szymanowski/Wheeling contend that the partnership owns the Danylko oil and gas lease and Danylko # 2 and # 4 gas wells and that Brace and BCD must account for the profits from these two wells. Appellant's Brief at 10.

¶ 12 On appeal, they state the following questions:

A. Whether the trial court erred in concluding that there existed no genuine issue of material fact as to whether an oil and gas lease (and gas wells developed thereunder) was a partnership asset?

B. Whether the trial court erred in concluding that there existed no genuine issue of material fact as to the claim of usurpation of a partnership opportunity (and breach of fiduciary duty) when one partner drills two additional gas wells for his own benefit on the same land, pursuant to the same lease, to the same depth, and in close proximity to the gas well drilled by the partnership?

¶ 13 In reviewing a summary judgment:

We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genu-

---

4. In December 2002, Brace and Szymanowski/Wheeling entered into a substantially identical Gas Well Agreement, backdated to October 1. Together, these two agreements constitute the partnership agreement of the parties. The second Gas Well Agreement, however, refers to "Robert H. Brace" instead of "BCD Properties, Inc." Amended Complaint, Exhibit D.

ine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Universal Health Services, Inc. v. Pennsylvania Property and Cas. Ins. Guar. Ass'n,* 884 A.2d 889, 892 (Pa.Super.2005) (internal citations omitted).

¶ 14 In interpreting contracts, we are guided by the following principles:

The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, "[w]e need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Abbott v. Schnader, Harrison, Segal & Lewis, LLP,* 805 A.2d 547, 553 (Pa.Super.2002) (internal citations omitted) (emphasis added).

¶ 15 As we examine the Gas Well Agreement, we agree with the trial court's conclusion that the agreement lends neither express nor implied support to Szymanowski/Wheeling's argument the Danylko lease and the Danylko # 2 and # 4 wells were intended to be partnership assets. A fair reading of the agreement demonstrates the parties' focus was on the singular mission of developing two gas wells, Danylko # 1 and Dougherty # 1. There was no mention of any additional investment by any party or any additional development or drilling on either the Danylko or Dougherty leases or any other leases. There was not even a passing reference to the Danylko or Dougherty leases themselves. The Gas Well Agreement defines a limited undertaking—the development of Danylko # 1 and Dougherty # 1 gas wells—for which Szymanowski/Wheeling would invest \$60,000 in return for which they would receive 20% of the net revenue after specified deductions.

¶ 16 The narrow scope of the partnership's business undertaking is further buttressed by the circumstances surrounding the execution of the Gas Well Agreement. The parties had no prior business relationship of any kind and only through an intermediary, Brace's son, did Szymanowski/Wheeling approach Brace with their desire to invest in an oil and gas drilling venture.[5] They understood Brace to be in the oil and gas business with various leases, equipment, a gathering system in place, and a market for production. Amended Complaint, ¶¶ 7 and 9. When Szymanowski/Wheeling executed the Gas Well Agreement on October 1, 2002, they knew Brace owned the Danylko and Dougherty leases and knew the leases were not as-

---

**5.** Szymanowski admitted Brace accepted them as investors, not because he "needed" an infusion of capital, but "essentially as a favor" because of their friendship with his son, Randall J. Brace. Szymanowski Deposition, 7/20/06, at 96–97. Brace concurred. Robert Brace Deposition, 12/4/06, at 78.

signed to BSW. They knew the Danylko #1 and Dougherty #1 were only days away from completion and were anxious to invest $60,000 in a gamble for a gas play.

¶17 Not only does the Gas Well Agreement fail to support Szymanowski/Wheeling's position, but, as the trial court emphasized in its summary judgment opinion, Szymanowski/Wheeling's depositions literally contradict their claim the Danylko lease and the Danylko #2 and #4 gas wells were ever intended to become partnership assets. Trial Court Opinion, 10/8/07, at 3–5.

¶18 The Wheeling deposition included the following admissions:

Q. So then going back to my question. You understood you didn't have an agreement with Mr. Brace or BCD to receive an interest in anything other than Dougherty No. 1 and Danylko No. 1 under this agreement as of October 1, 2002, that possibly in the future there might be some discussion about other opportunities, but as of this date the only thing you were getting an interest in was Dougherty 1 and Danylko 1; is that right?

A. I understood that that's—yes.

. . . .

Q. Okay. Just to make sure that I'm clear on this point, though. You understood that neither you nor Mr. Szymanowski were being promised the right to participate in any well other than Dougherty 1 and Danylko 1; is that correct?

A. I had no reason to think beyond the two wells mentioned here.

. . . .

Q. Did Bob Brace or Randy Brace say anything to you that in your mind communicated a commitment or promise to you guaranteeing you the right to participate in any way with respect to any well other than Dougherty 1 or Danylko 1?

A. There was never a promise. There was never an agreement for anything in the future other than—but it seemed to me that when I asked—when I indicated what I was interested in, that there was no reasons why that couldn't happen.

Q. Understood.

A. I was not told—I was not told otherwise, so I assumed that it was a good possibility.

Q. Okay. So it was a possibility— they weren't ruling that out. They just weren't promising anything to you; is that fair?

A. Sure. That's correct.

Wheeling Deposition, 7/20/06, at 52, 61, 62.

¶19 The Szymanowski deposition confirmed these admissions:

Q. And that's what Mr. Wheeling told us, that there's the possibility that you could participate in other wells in the future; is that right?

A. Correct.

Q. All right. And did you understand when you executed [the Gas Well Agreement] that the only two wells within the scope of this agreement were Dougherty 1 and Danylko 1?

A. Correct. That's what it stated.

. . . .

Q. Do you have any knowledge of Robert Brace ever assigning the Danylko lease or the Dougherty lease to any other person or any other entity?

A. No.

Q. Was that ever discussed?

A. No.

Szymanowski Deposition, 7/20/06, at 17, 33.

¶20 Unable to find contract language incorporating the Danylko lease within the partnership, Szymanowski/Wheeling direct

our attention to Brace's retention of a one-eighth overriding royalty, the partnership's 2002 federal income tax return, and some general precepts of partnership law. Upon this foundation they attempt to construct an argument the parties intended BSW would own the Danylko lease.

¶ 21 Szymanowski/Wheeling submit Brace's retention of a one-eighth overriding royalty is evidence from which a fact-finder could infer Brace assigned the lease to BSW. Szymanowski/Wheeling cite *McRoberts v. Phelps,* 391 Pa. 591, 592, 138 A.2d 439, 441 (1958) for the proposition overriding royalties are fractional interests in gross production typically associated with an assignment of an oil and gas lease by a lessee-assignor who typically retains an override. No doubt, that may be the case but overrides can also arise in other contexts. For example, in *Brenimer v. Cockburn,* 254 F.2d 821, 824 (10th Cir. 1958), the court characterized a working interest owner's assignments of 1% interests in production as overriding royalties even though not associated with assignments of the underlying lease. In *Barker v. Boyer,* 14 Kan.App.2d 502, 794 P.2d 322 (1990), the Kansas Court of Appeals illustrated a *lessor's* reservation of an overriding royalty carved out of the working interest:

> The leading case on this issue is *Williams v. Sohio Petroleum Co.,* 18 Ill.App.2d 194, 151 N.E.2d 645 (1958). Lessors owned one-fourth of the mineral rights, and the lease had a lesser interest clause and the following typed provision: " 'In addition to the royalties provided for above, the Lessors hereby reserve an overriding royalty of 1/32nd of 7/8ths of all oil and gas produced and saved under and by virtue of this oil and

gas lease.' " 18 Ill.App.2d at 196, 151 N.E.2d 645.

*Id.* at 325. In *Boley v. Greenough,* 22 P.3d 854 (Wyo.2001) (emphasis added), the Wyoming Supreme Court recounted:

> Over time, the use of the term "overriding royalty" has evolved and has more recently been used to describe an interest carved out of the lessee's share of the oil and gas. Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms at 750 (10th ed. 1997). A discussion of the evolution of the term is contained in the Manual of Oil and Gas Terms and confirms that, during the time frame these assignments were executed, "overriding royalty" was also used to indicate a nonparticipating royalty and "added nothing to the meaning of the term 'royalty.' " *Id.,* at 749. Recent treatises continue to use the phrase to apply to nonparticipating royalties:
>
>> Perhaps the only safe way to define the term "overriding royalty" is to say that it is a fractional interest in the gross production of oil and gas, in addition to the usual royalties paid to the lessor. The term may be used in referring to a nonparticipating royalty interest in perpetuity or for a term of years created by the land or mineral owner prior to a lease for oil and gas.
>
> 3 W.L. Summers, The Law of Oil and Gas § 554 at 624 (1958).

*Id.* at 860.

¶ 22 We conclude that Brace's reservation of an overriding royalty is simply his reservation of a fractional portion of the production revenue from the two wells. Standing alone, the override by itself does not create a material issue of fact sufficient to bar summary judgment.[6]

---

6. There is a second ground on which to reject the argument the override supports the inference Brace assigned the lease. The parties

never discussed the override until it became a bone of contention four or five months after the formation of the partnership and comple-

¶ 23 Szymanowski/Wheeling further string together the argument BSW's 2002 partnership income tax return's deduction of $156,288 in intangible drilling costs proves Brace assigned the lease to BSW. The assignment must have been made, they reason, because, without an assignment of the lease and the working interest, the partnership could not lawfully deduct intangible drilling costs under the Internal Revenue Code and Treasury Regulation § 1.614–2(b). Without some additional evidence in the record, such as the parties' personal understanding of the income tax issues or the instructions given to the tax return preparer, we do not regard a tax return as evidence of a lease assignment. *See In re Irrevocable Inter Vivos Trust Agreement of Hanley*, 307 Pa.Super. 153, 452 A.2d 1360, 1370 (1982), *aff'd* 503 Pa. 119, 468 A.2d 1093 (1983) (dismissing an analogous argument with respect to the federal estate tax law and commenting "it is plausible that the executor or administrator of the respective estates failed to make the complained of inclusion as a 'result of [his or her] misunderstanding of the Federal tax laws.' *Sayre's Estate*, [443 Pa. 548, 552, 279 A.2d 51, 53 (1971)]'").

¶ 24 Szymanowski/Wheeling also construct an argument that, because Brace did assign (or should be deemed to have assigned) the leasehold with respect to the Danylko # 1, it follows Brace should be deemed to have assigned his *entire* lease-hold interest, including the two additional wells, under Partnership Code [7] § 8313 (Partnership property), 15 Pa.C.S.A. § 8313. Section § 8313 provides: "**(d) Extent of interest acquired.**—A conveyance to a partnership in the partnership name, though without words of inheritance, passes the entire estate of the grantor unless a contrary intent appears." However, because Brace did not assign the lease with respect to Danylko # 1, we need not reach the question of the scope of any assignment.

¶ 25 Although not discussed by the trial court, we also determine the Statute of Frauds, 33 P.S. § 1, precludes enforceability of any unwritten, unsigned agreement to assign the lease to BSW.[8] We have previously applied the Statute to assignments of oil and gas leases. In *Stockdale v. Sellers*, 102 Pa.Super. 447, 157 A. 30 (1931), we held:

> We believe the interest in gas well number one, which the plaintiff claims to have purchased, is real estate and title could only pass under the Statute of Frauds by an assignment or deed in writing. An agreement to assign an interest in a lease or leasehold for oil and gas must be in writing.

*Id.* at 31. Szymanowski/Wheeling regard *Stockdale* as "bad law" because it ignored the Supreme Court's earlier decision in *Smith v. Brown*, 294 Pa. 203, 143 A. 913

tion of Danylko # 1. In fact, Szymanowski/Wheeling challenged the override in their Amended Complaint, thus confirming the parties never reached an agreement on its legitimacy or its significance. *See* Szymanowski/Wheeling's Amended Complaint at ¶ 25 (alleging the parties "did not contemplate or agree" Brace could reserve an override). Wheeling confirmed he first learned of the override when he read the first production statement in or about January 2003, four months after the formation of the partnership. Wheeling Deposition, 7/20/06, at 93–6.

7. 15 Pa.C.S.A. §§ 8101–8998.

8. We note we may affirm the trial court on grounds not relied on by the trial court. *Commonwealth v. Miller*, 787 A.2d 1036, 1038 (Pa.Super.2001). Brace raised the Statute of Frauds defense in his pleadings and summary judgment motion. Brief in Support of Defendants' Motion for Partial Summary Judgment at 12–13.

(1928), where, during the existence of a partnership in the oil and gas, coal brokerage and lumber business, a partner acquired an oil and gas lease in his name alone and refused to share its profits with the partnership. The Supreme Court held when a partner acquires title in his name to partnership property, especially when funded with partnership monies, he will be regarded as a constructive trustee for the partnership. *Id.* at 207–208, 143 A. at 914–915 (citing *Lacy v. Hall et al.*, 37 Pa. 360, 365 (1860)). Constructive trusts are enforceable despite the Statute of Frauds. *Id.* More recently, our Supreme Court has traced the long line of cases confirming this point in *Silver v. Silver*, 421 Pa. 533, 536, 219 A.2d 659, 661 (1966) (holding "a constructive trust, being implied by law, is expressly excluded from the operation of the Statute.").

¶ 26 *Smith* is distinguishable for several reasons. There are no facts or pleadings supporting a constructive trust in the present case. In addition, *Smith* permitted parole evidence to determine whether an actual lease assignment *during the existence of a partnership* should be treated as property of the partner in his individual capacity or property of the partnership. Here, there was no lease assignment at all, and, thus, no assignment for the trial court to characterize as partnership *vis-`a-vis* individually owned property. Here, the issue is whether the parties ever agreed at all to an assignment. If so, *Stockdale* precludes the enforcement of such agreements when not in writing and signed.

¶ 27 Citing *CST, Inc. v. Mark,* 360 Pa.Super. 303, 520 A.2d 469, 471 (1987) and Partnership Code § 8334(a) (Partner accountable as fiduciary), Szymanowski/Wheeling also contend Brace's development of Danylko #2 and #4 wells usurped business opportunities the law preserves for partnerships and other business entities. However, even *CST, Inc.* limits the application of the doctrine to a "business opportunity which is within the scope of [the entity's] own activities and of present or potential advantage to it." *Id.* (internal citations omitted). *See also Seaboard Industries, Inc. v. Monaco,* 442 Pa. 256, 262, 276 A.2d 305, 309 (1971). Here, as explained above, BSW was formed with the singular mission of developing two named gas wells in specified locations. The record is barren of evidence suggesting a more expansive mission. To the contrary, there is undisputed evidence Szymanowski/Wheeling harbored no doubt Brace refused to commit to any further drilling projects with them.

¶ 28 Citing *Latta v. Kilbourn,* 150 U.S. 524, 541, 14 S.Ct. 201, 37 L.Ed. 1169 (1893), Szymanowski/Wheeling contend that Brace's development of Danylko #2 and #4 breached a fiduciary duty not to compete with the partnership. *Latta* held a partner "cannot carry on another business in competition or rivalry with that of the firm, thereby depriving it of the benefit of his time, skill, and fidelity, without being accountable to his copartners for any profit that may accrue to him therefrom; ..." *Id.* Szymanowski/Wheeling, however, fail to produce any evidence of competition or of Brace's withholding of his time, skill and fidelity to the management of Danylko #1 and Dougherty #1 wells. No evidence is in the record suggesting Danylko #2 and #4 impacted the production from BSW's two wells.

¶ 29 In conclusion, we hold the trial court did not commit error or abuse its discretion in granting summary judgment in favor of Brace and BCD.

¶ 30 Affirmed. Jurisdiction relinquished.