J-A02019-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| TCA GIRARD, LP, TCA 12TH STREET, LP TCA GS MEZZANINE, LP AND TCA 12TH MEZZANINE, LP | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| MORGAN, LEWIS & BOCKIUS, LLP, ERIC L. STERN, ESQUIRE AND MICHAEL J. PEDRICK, ESQUIRE V. TRINITY CAPITAL ADVISORS, LLC | |
| Appellee | No. 245 EDA 2013 |

Appeal from the Order Entered December 21, 2012
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): No. 01612 May Term, 2010

BEFORE:  FORD ELLIOTT, P.J.E., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.                    **FILED SEPTEMBER 18, 2014**

TCA Girard, LP, TCA 12th Street, LP, TCA GS Mezzanine, LP, and TCA 12th Street Mezzanine, LP, (collectively, "TCA") appeal from the order entered December 21, 2012, in the Court of Common Pleas of Philadelphia County, granting summary judgment in favor of defendants, Morgan, Lewis & Bockius, LLP, Eric L. Stern, Esquire, and Michael J. Pedrick, Esquire (collectively, "ML&B").  The appeal stems from the trial court's order granting a motion in *limine* to preclude TCA's expert, Lawrence Goodman,

_____

[*] Retired Senior Judge assigned to the Superior Court.

from utilizing a certain methodology because the court found it was contrary to the methodology set forth within the terms of the applicable loan agreement. TCA argues the trial court erred and/or abused its discretion: (1) by failing to consider and apply evidence of customs, practices, usages, and terminology in its determination of the meaning of an undefined contract term in the loan agreement; and (2) by disputing the conclusion of the expert and precluding his testimony, which erroneously invaded the province of the jury.[1] *See* TCA's Brief at 3-4. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

The trial court set forth the underlying facts as follows:

> This is a legal malpractice action which arises from the financing of a highly-leveraged acquisition of a long-term ground lease for Girard Square, a property in Philadelphia, Pa. Plaintiffs [TCA] are four special purpose entities created by their sponsor Trinity Capital Advisors LLC to acquire and operate the Girard Square property. Defendants [ML&B] were the lawyers engaged by TCA to provide legal services in connection with the acquisition.
>
> . . . .
>
> TCA sought to acquire a long-term ground lease on a property known as Girard Square. Girard Square is the city block bordered by Market Street, 12th Street, Chestnut Street, and 11th Street in Philadelphia, Pa. The property consists of four multi-tenant buildings and parking garage in the Chestnut Street Building. The fee interest is owned by the Estate of Stephen Girard.

_____

[1] Based on the nature of TCA's claims, we will address them together.

In the summer of 2006, TCA engaged ML&B to provide legal representation and advice in connection with the potential acquisition of Girard Square. ML&B's responsibilities included preparing, reviewing, negotiating a number of transactional documents and instruments and offering advice to effect the lending transactions necessary to enable TCA to acquire its interest in Girard Square.

On October 17, 2006, a 75 year Ground Lease Agreement was entered into between the City of Philadelphia, Trustee under the Will of Stephen Girard, and TCA. From April 2007 through June 2007, the material terms and conditions of the Loan Agreement and supporting documentation were negotiated by potential lender United Bank of Scotland (hereinafter "UBS") and ML&B on behalf of TCA.

On June 18, 2007, the loan closed. UBS funded a loan for $112.5 million for a term of one year, set to expire on July 9, 2008, with a one year extension option if Girard Square met certain financial benchmarks.[1] The Loan Agreement provided that $2.5 million of the amount borrowed should be deposited with UBS and designated as an Interest Shortfall Reserve Fund for the purpose of funding an escrow fund for the payment of Debt Service and any other amounts due under the loan agreements.[2]

[1] The financial benchmarks were set forth in the June 18, 2007 Loan Agreement § 2.3.2 (b).

[2] June 18, 2007 Loan Agreement § 6.8.

[Also on] June 18, 2007, Girard Square entered into a Cash Management Agreement with UBS and Wells Fargo, the loan servicing agent. This agreement required all rent to be deposited into a deposit account and then be disbursed according to a certain priority set forth within the Cash Management Agreement.[3]

[3] The order of disbursement was as follows: 1. Taxes, 2. Insurance, 3. Debt Service, 4. Capital Expenditures if funds on reserve for such expenditures are less than $100,000, 5. Rollover Funds if funds on reserve for such expenditures are less than $100,000, 6. Any default rate interest or late payment charges, 7. Operating Expenses, 8. Extraordinary

Expenses, 9. Excess Cash Flow Account and 10. Borrower Remainder Account.

During the course of the year term, TCA made its debt service payments, however the payment of debt service left insufficient cash to pay operating expenses. The Loan Agreement and the Cash Management Agreement did not permit TCA to have access to reserves sufficient to pay the operating expenses. In order for TCA to access the Interest Shortfall Reserve Fund, TCA would have to have zero dollars left to pay operating costs. Hence, if after paying out the first items as set forth in the Cash Management Agreement's priority list, taxes, insurance, etc., a small amount of revenue remained, TCA could not access the Interest Shortfall Reserve Fund, even though the amount remaining was insufficient to cover the operating expenses. Upon become aware of the results of this restriction, TCA began renegotiating the loan agreement with UBS.

On December 14, 2007, the loan agreement was amended. The loan agreement required TCA to repay $11 million of the original $112.5 million by reducing certain reserve amounts and breaking off the $7.5 million mezzanine loan, reducing the mortgage loan balance to $94 million. The amended loan agreement also changed the loan maturity date from July 9, 2008 to May 9, 2008 and removed the one year renewal option.

The Cash Management Agreement was also amended to change the disbursement order. Taxes, insurance, debt service and default payments were the top priority, operating expenses became the fifth priority. Additionally, the amendments permitted TCA to draw up to $1,050,000 from the [I]nterest [S]hortfall [R]eserve [F]und for the payment of utilities and payroll. Girard Square made five draws of $210,000 in 2008.

In January 2008, UBS assigned the mezzanine loan to Joss Realty Partners ("Joss"). By April 2008, TCA drew the maximum amount permitted by the December 2007 Amendment from the Interest Shortfall Reserve. On July 15, 2008, TCA relinquished its interest in the Girard Square Property and entered into a Loan Assumption, Substitution and Mortgage and Assignment of Leases and Rents Modification Agreement with UBS. Joss ultimately assumed the mortgage on Girard Square and took over the property including all outstanding payables on the property. The pledges of additional collateral and the

guarantees on the loan by TCA and certain other individuals were released.

On May 12, 2010, TCA instituted [a] suit by writ of summons against ML&B and the various attorneys who worked on the TCA matter alleging legal malpractice. Specifically, TCA alleged that the Loan and Cash Management Agreements were not drafted consistent with TCA's best interest, that ML&B failed to properly advise it of the risk inherent in the documents as drafted and failed to appreciate the legal and practical implications of the agreements including but not limited to accessing the reserve fund to pay operating expenses.

On June 3, 2010, after the filing of a rule by ML&B, TCA filed a complaint alleging claims for professional negligence and for breach of contract. On August 12, 2010, the defendant ML&B filed an answer to the complaint with new matter and counterclaims for breach of contract and unjust enrichment based on unpaid services. On August 13, 2010, defendant ML&B filed a joinder complaint against Trinity Advisors, Inc.

TCA retained Lawrence M. Goodman to provide expert testimony to illustrate that the operating expense deficit was the result of TCA's inability to access funds in the Interest Shortfall Reserve Fund since TCA was unable to access said reserve. Goodman was also retained to calculate Debt Service Coverage Ratio ("DSCR") using projected financial results for the year ended December 31, 2008 to determine if Girard Square would have been in compliance with the DSCR requirement for a one year renewal option in its June 18, 2007 Loan Agreement with UBS.[4] Goodman opined that the DSCR requirement would have been met for the one year loan extension.[5] In rendering this opinion, Goodman assumed the DSCR would be calculated using net operating income for the year ended December 31, 2008 based on actual results for the months January 2008 through June 2008 and projected results from July 2008 through December 2008.[6]

[4] Goodman issued two reports, one dated November 2, 2011 and January 17, 2012 as well as an affidavit to support his opinions.

[5] TCA was only pursuing damages based on this theory of liability.

- 5 -

6  Goodman made additional assumptions in reaching his opinion including but not limited to using the prevailing July 2008 LIBOR rate.

Trial Court Opinion, 7/10/2013, at 1-5.

On December 30, 2011, ML&B filed a motion for summary judgment.

As noted by ML&B,

[i]n a malpractice action, a plaintiff must establish three elements in order to recover:

(1) The employment of the attorney or other basis for duty;

(2) The failure of the attorney to exercise ordinary skill and knowledge; and

(3) That such failure was the proximate cause of damage to the plaintiff.

***Boyer v. Walker***, 714 A.2d 458, 462 (Pa. Super. 1998), *citing **Bailey v. Tucker***, 621 A.2d 108, 112 (1993).[2]  ***See also*** ML&B's Motion for Summary Judgment, 12/30/2011, at 18.  Moreover, generally,

_____

2  When it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action…is proof of actual loss.  The mere breach of a professional duty, causing only speculative harm, is insufficient for a finding of professional negligence.

The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages….  Thus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount.

*(Footnote Continued Next Page)*

for a plaintiff to successfully maintain a cause of action for breach of contract requires that the plaintiff establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. . In the narrow realm of legal malpractice claims based on an alleged breach of a contract between an attorney and a client, the appellate courts of this Commonwealth have jurisprudentially established, and refined through time, the specific facts which a plaintiff is required to demonstrate in order to establish that a breach of a contractual duty on the part of the attorney has occurred.

. . . .

[I]f a plaintiff demonstrates by a preponderance of the evidence that an attorney has breached his or her contractual duty to provide legal service in a manner consistent with the profession at large, then the plaintiff has successfully established a breach of contract claim against the attorney.

***Gorski v. Smith***, 812 A.2d 683, 692, 697 (Pa. Super. 2002) (citation omitted).

ML&B argued there was "no evidence sufficient to permit a jury to find a fact essential to [TCA]'s claims, namely, that [ML&B's] alleged actions were the proximate cause of actual harm to [TCA]." ML&B's Motion for Summary Judgment, 12/30/2011, at 18-19. ML&B states that TCA's claims rested upon pure speculation, specifically TCA's contention "if [ML&B] had asked UBS for loan terms allowing [TCA] to access reserves to pay operating expenses, UBS would have agreed; or that if [TCA] had been warned by [ML&B] to walk away from the deal, had they been unable to get the more

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

***Boyer***, 714 A.2d at 462 (citations and quotation marks omitted).

- 7 -

favorable terms, [TCA] then would have done so." *Id.* at 3 (italics removed).[3] Moreover, ML&B asserted TCA did not link the alleged damages to its "purported conduct through expert reports or otherwise," and therefore, TCA would be "unable to prove at trial a necessary element of their claims – actual damages proximately caused by [ML&B]'s conduct." *Id.* at 4.[4] Likewise, ML&B claimed that TCA "cannot show that [ML&B] breached any standard of care owed" to TCA. *Id.*

On February 9, 2012, TCA filed an answer to ML&B's motion for summary judgment contending there was evidence to support the legal malpractice action, in which a jury could reasonably find the following:

_____

[3]  Related to this argument, ML&B stated that TCA had "the burden to demonstrate that UBS would have agreed to include provisions in the loan documents that would have permitted access to the Interest Shortfall Reserve or that [TCA] would not have closed on the loan had UBS refused to include such provisions." Motion for Summary Judgment, 12/30/2011, at 22. ML&B alleged there was no evidence establishing either occurrence. *Id.*

[4]  Relevant to this assertion, ML&B stated: "Through their expert, Mr. Goodman, [TCA] merely assert[s] that if TCA would have had access to the Interest Shortfall Reserve from the start, TCA would not have lost the second year option on the loan when it renegotiated the Loan Agreement in December 2007," and that Goodman opined that TCA would have been qualified for the second year by meeting the conditions of the option. *Id.* at 25-26. Moreover, ML&B averred that Goodman's conclusion "rests on aggressive and unsupported assumptions and ignores market realities, Goodman does not discuss whether [TCA] eventually would have lost the property at the end of the second year, despite a one-year loan extension," and he "never mentions the issue or the unprecedented decline in the commercial real estate market and its devastating effect on attempts to refinance by developers[.]" *Id.* at 26.

> (i) [ML&B] breached its professional duty of care; (ii) [ML&B]'s breach of the standard of care, by depriving TCA of access to funds necessary to operate Girard Square, forced TCA to give up its loan-renewal right; (iii) loss of the loan-renewal right forced TCA to relinquish Girard Square at the end of the first year of the loan term; and (iv) TCA was, accordingly, damaged by the loss of the value of its investment in the Girard Square property, as well as other incidental losses.

TCA's Memorandum of Law in Opposition to ML&B's Motion for Summary Judgment, 2/9/2012 at 3. Specifically, TCA asserted ML&B did not satisfy the standard of care because it did not fulfill its obligation to "scrutinize" the Interest Shortfall Reserve Fund provision of "Section 6.8 of the Loan Agreement and the waterfall provisions in the Cash Management Agreement … and 'disclose to [TCA] the full import' of those provisions[.]" *Id.* at 35 (citation omitted). Moreover, TCA stated ML&B was obligated "to ensure that the legal documents embodying the financing transaction worked, in light of TCA's clear objective of having a contractual mechanism that permitted it to meet its debt service obligations and pay its operating expenses[.]" *Id.* at 41-42 (emphasis removed, footnote omitted).

Likewise, TCA claims the record supported the causation element of its malpractice suit. TCA states that if ML&B had brought the problem to light, UBS would readily have agreed to modify the Interest Shortfall Reserve Fund and/or the waterfall provisions to allow TCA access to sufficient cash to operate Girard Square, based on the following: (1) according UBS's loan officer, Oliver Striker, the "Interest Shortfall Reserve was included in the loan documents by UBS with the precise intention that the reserve be used

to 'bridge' the shortfall in debt service funds that was anticipated to remain after use of revenue to pay operating expenses[;]" (2) the June 13, 2007, loan term sheet, consistent with Striker's testimony, showed that "the 'anticipated interest shortfalls' in respect of which the Interest Shortfall Reserve was established were related directly to, and would be occasioned by, the .75x DSCR recited in the term sheet[;]" (3) UBS was in the business of "doing good deals" and therefore, it would not have been "in the business in June of 2007 of entering into loan transactions that, on their face, would be doomed to failure from the start[;]" and (4) UBS "agree[d] to a modification in the reserve provision later, when it was alerted to the fact that Section 6.8 of the Loan Agreement would have to be modified to allow TCA to continue operating Girard Square." *Id.* at 46-47.

Additionally, TCA contends there was ample evidence to demonstrate that

> (a) with access to the reserve funds to pay operating expenses, or to pay debt service after using revenue to pay such expenses, TCA would have operated Girard Square successfully at least through July, 2008, (b) TCA would have qualified for the loan renewal in July 2008 had it not been compelled to relinquish the renewal option, and, to the extent it may be relevant, (c) TCA would have been able to operate Girard Square through the ensuing additional year of the Lease Term, until 2009.

*Id.* at 49 (emphasis removed). To support this argument, TCA relied on its accountant expert, Goodman. TCA stated Goodman was prepared to testify to the following: (1) "that, had TCA been able to access the Interest Shortfall Reserve from the outset in the manner that TCA had expected,

- 10 -

there would have been ample cash available to pay all of the Girard Square operating expenses, leaving TCA in position to continue with the operation of the property at least until July 9, 2008 expiration of the initial one-year loan term[;]" (2) "TCA would have had sufficient cash to pay its operating expenses throughout 2008, and would not have been compelled in late 2007 to bargain away its renewal right to gain access to operating funds[;]" (3) that "had it been able to preserve its loan-renewal right, TCA would have met the qualifications for renewal imposed by Section 2.3.2(b) of the original Loan Agreement[;]" and (4) "had TCA retained its renewal option and actually renewed the loan for the additional one-year term, its net operating income during the 12 months of the extended loan term would have been fully sufficient to pay its operating expenses through the end of June 2009." *Id.* at 50-51.

The trial court originally denied ML&B's motion for summary judgment on July 2, 2012.

On October 1, 2012, ML&B filed several motions in *limine* to exclude TCA's experts, including Goodman. ML&B noted Goodman's "role is to attempt to demonstrate that [TCA] would not have lost the Girard Square property in July of 2008 if the loan documents worked in such a way as to permit [TCA], from the inception of the loan, to have access to the Interest Shortfall Reserve to pay operating expenses." ML&B's Motion in *Limine* to

Exclude the Testimony of Lawrence M. Goodman, 10/12/2012, at 2. ML&B

argued Goodman's testimony should be barred based on the following:

> 14. First, his testimony rests almost entirely on speculation as evidenced by his frequent use of such words as "may have," "possible," "could have," and "expect."
>
> 15. Second, he relies on "facts" which are not of record and, in some cases, the "facts" are actually contradicted by the record.
>
> 16. Third, his analysis of the Loan Agreement falls short since he considers only two of four conditions for the renewal of the Girard Square loan; and he then ignores the actual language of the Loan Agreement, substituting his own language instead.
>
> 17. And finally, giving the foregoing, his testimony would be prejudicial and should not be allowed to go to a jury.

*Id.* at 3.

With respect to the Interest Shortfall Reserve Fund, ML&B contended

Goodman makes several unsupported assumptions: (1) "that had TCA had

access to the Interest Shortfall Reserve from the close in June 2007, it would

have not needed to amend the loan and subsequently UBS would not have

reduced the reserve in December[;]" and (2) "that with access to the

Interest Shortfall Reserve, TCA would *not* have drawn down from it before

the end of the year 2007 in order to pay operating expenses and that the full

amount in the reserve would have been intact in December." *Id.* at 9

(emphasis in original).

With respect to the one-year loan extension, ML&B asserted Goodman

focused solely on two of the four requirements relating to the DSCR, he used

"forward-looking projections rather than Girard Square's actual

performance," and he ignored the language of the Loan Agreement provisions, which "explicitly require monitoring of DSCR based on historical (*i.e.*, actual) financials, not projections." *Id.* at 13. (footnote omitted).

TCA filed an answer in opposition to ML&B's motion in *limine* on October 31, 2012. TCA argued that Goodman's opinions were fact-based and not speculative. *See* TCA's Memorandum of Law in Opposition to ML&B's Motion in *Limine* to Exclude the Testimony of Lawrence M. Goodman, 10/31/2012, at 11. Moreover, TCA stated that Goodman's DSCR calculation was "entirely consistent with what the Loan Agreement actually provides." *Id.* at 14 (footnote omitted).[5] To support this argument, TCA pointed to the following:

> Section 2.3.2(b) itself does not explicitly state that a DSCR calculation for purposes of qualifying for the loan extension must be based on the annualization of the preceding six months' of actual, historical data . In fact, Section 2.3.2(b) does not specify the use of revenue and expense numbers for <u>any</u> particular period.… As his Supplemental Report and his affidavit show, Goodman's DSCR calculation utilizes <u>precisely</u> the method stipulated in these two Loan Agreement provisions: his determination of what the DSCR would have been if calculated in July, 2008 is "based upon" the historical financial data for the "trailing six (6) month period" -- the period from January 1 to June 30, 2008 -- which he then "annualizes" to arrive at data for the entire calendar year 2008.

*Id.* at 16-17 (citations and footnotes omitted).

_____

[5] TCA indicated that it intended "to elicit and rely at trial solely on the DSCR calculation set forth in [Goodman's] Supplemental Report[.]" TCA's Memorandum of Law in Opposition to ML&B's Motion in *Limine* to Exclude the Testimony of Lawrence M. Goodman, 10/31/2012, at 15.

Oral argument was held on December 13, 2012. At that time, the court and the parties discussed the outstanding motions in *limine*, including ML&B's objection to Goodman's report. On December 14, 2012, the court granted in part and denied in part the motion in *limine* as it pertained to Goodman. The court ruled Goodman was not permitted to testify with regard to the DSCR using any forward-looking projection beyond June 30, 2008. The court granted TCA leave to file an additional report for the appropriate period using historical data only. TCA subsequently informed the court that no additional report would be forthcoming, and ML&B renewed its motion for summary judgment.

Following an additional hearing, on December 21, 2012, the trial court granted the motion, stating:

> In light of this court's order dated December 14, 2012 granting [ML&B]'s Motion in Limine to preclude [TCA]'s expert report of Lawrence Goodman and [TCA]'s failure to produce a supplemental report within the limitations defined by the court, [ML&B] orally renewed their Motion for Summary Judgment as it related to proximate cause and [TCA]'s ability to prove damages. Although [TCA] oppose[s] the Motion for Summary Judgment, [it] concede[s] that in light of this court's order precluding Lawrence Goodman's report, [TCA is] unable to prove proximate cause and damages. [TCA] further informed the court [it was] only pursuing one theory of liability, *i.e.* whether [TCA] would have met the conditions to extend the loan for a second year. As such, this order is case dispositive and final.[1]
>
> [1] [ML&B] informed the court they will be withdrawing their counterclaim without prejudice by stipulation which will toll the limitations period so [ML&B] may reassert their claim.

Order, 12/21/2012, at 1.  This appeal followed.[6]

We begin with our well-settled standard of review:

"[O]ur standard of review of an order granting summary judgment requires us to determine whether the trial court abused its discretion or committed an error of law[,] and our scope of review is plenary."  **Petrina v. Allied Glove Corp.**, 46 A.3d 795, 797-798 (Pa. Super. 2012) (citations omitted).  "We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party."  **Barnes v. Keller**, 62 A.3d 382, 385 (Pa. Super. 2012), *citing* **Erie Ins. Exch. v. Larrimore**, 987 A.2d 732, 736 (Pa. Super. 2009) (citation omitted).  "Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered."  **Id**.  The rule governing summary judgment has been codified at Pennsylvania Rule of Civil Procedure 1035.2, which states as follows.

**Rule 1035.2. Motion**

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden

---

[6]  The court ordered TCA to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  TCA filed a timely concise statement on February 22, 2013.  The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on July 10, 2013.

of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.

"Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment." **Babb v. Ctr. Cmty. Hosp.**, 47 A.3d 1214, 1223 (Pa. Super. 2012) (citations omitted), *appeal denied,* 65 A.3d 412 (Pa. 2013). Further, "failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." **Id**.

> Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

**Id**. *citing* **Reeser v. NGK N. Am., Inc.**, 14 A.3d 896, 898 (Pa. Super. 2011), *quoting* **Jones v. Levin**, 940 A.2d 451, 452-454 (Pa. Super. 2007) (internal citations omitted).

**Cadena v. Latch**, 78 A.3d 636, 638-639 (Pa. Super. 2013).

Moreover, both of TCA's arguments concern the court's granting of ML&B's motion in *limine* with respect to Goodman. Therefore, we note that, generally, our review of a trial court's decision to grant or deny a motion *in limine* is based on the following:

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In

- 16 -

addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*Lykes v. Yates*, 77 A.3d 27, 32 (Pa. Super. 2013), *quoting* *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa. Super. 2010).

We begin with TCA's contention that the interpretation of the Loan Agreement is governed by New York law. TCA's Brief at 32. Specifically, TCA states that under New York law, the court was obliged, but failed, to consider and apply evidence of "customs, practices, usages, and terminology" in its determination of the meaning of the term, "annualized," as set forth in the Loan Agreement. *Id.*[7]

With respect to this dispute, we are constrained to conclude that such arguments were not preserved for appellate review in TCA's February 22, 2013, Rule 1925(b) concise statement.[8] *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with

_____

[7] Nevertheless, TCA states that the same conclusion would be dictated by the application of Pennsylvania law. TCA's Brief at 38.

[8] TCA claims its "overarching" language of contract interpretation and custom and usage properly preserved the arguments in its concise statement. *See* TCA's Reply Brief at 17. We disagree. A review of the concise statement reveals no averments regarding New York governing law or that New York law requires evidence of "customs, practices, usages, and terminology" for interpreting a contract. Rule 1925(b) requires that a party "shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa.R.A.P. 1925(b)(4)(ii). Here, it is apparent that TCA did not identify this claim with sufficient detail to demonstrate the alleged error as the trial court did not address the issue in its Rule 1925(a) opinion.

the provisions of this paragraph (b)(4) are waived."); ***see also Commonwealth v. Lord***, 719 A.2d 306, 309 (Pa. 1998) (holding that if an appellant is directed to file a concise statement on appeal pursuant to Rule 1925(b), any issues not raised in that statement are waived); ***McCausland v. Wagner***, 78 A.3d 1093, 1099 n.2 (Pa. Super. 2013) (applying ***Lord*** to a civil case and finding waiver for failure to raise issue in concise statement).

Moreover, we note TCA did not challenge ML&B's citation to or use of Pennsylvania law in its Answer to ML&B's Motion for Summary Judgment and Opposition to ML&B's Motion in *Limine* to Exclude the Testimony of Lawrence M. Goodman, and it did not dispute the application of Pennsylvania law at the December 13, 2012, proceeding before the trial court. Consequently, it cannot be said that TCA successfully raised the contention that New York law should apply to this dispute, inasmuch as this appears to be the first time TCA is raising the argument and this assertion was not a point of contention between the parties during the prior history of this case. ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal").

Turning to the remainder of TCA's issues, TCA argues the court erred by excluding and failing to consider Goodman's proposed testimony

concerning the appropriate method of calculating the DSCR by "annualizing"[9] the trailing six-months financial results. *See* TCA's Brief at 31. As a follow-up to this argument, in its second issue, TCA claims the trial court erred by disputing the conclusion of the expert and precluding his testimony, which erroneously invaded the province of the jury. *Id.* at 43-45.

TCA specifically argues that although the trial court properly concluded "that some method of 'annualization' was appropriate, [it] erred by coming to [its] own interpretation of that term (and of the companion term "based on") without any consideration … of Mr. Goodman's proposed testimony as to the proper interpretation of 'annualize' (and with it, of the phrase 'based on')." TCA's Reply Brief at 4 (emphasis in original). Furthermore, TCA contends the trial court erred in holding Section 2.3.2(b) of the Loan Agreement "contemplated 'only annualizing the actual first six (6) months'" and interpreted "annualize" as "a process whereby annual revenue and expense figures are to be ascertained solely by multiplying the six-month figures by a factor of two." *Id.* at 9. TCA asserts the plain language of Section 2.3.2(b), the definition of DSCR, and the provisions of Section 4.1.6 did not provide or dictate how the DSCR was to be calculated under Section 2.3.2(b). *Id.* at 11-13. Likewise, it states the plain language of the Loan Agreement does not support the argument that any DSCR calculation must

---

[9] "Annualize" means "to calculate for or as for an entire year[.]" THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 84 (2nd ed. 1987).

exclusively utilize the historical figures as set forth in the financial statement. *Id.* at 13-15. Additionally, TCA rejects the court's interpretation of "annualized" to prohibit any "adjustments" or "projections" to the financial results. *Id.* at 31-32. Lastly, it states the Loan Agreement is silent as to whether the contract terms, "annualized" and "based on," envisioned any adjustments to the historical financial results. *Id.* at 35.

Based upon TCA's argument, we are called upon to review the trial court's interpretation of the Loan Agreement. Therefore, applicable to this dispute are the principles of contract interpretation:

> The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, "[w]e need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Szymanowski v. Brace*, 2009 PA Super 218, 987 A.2d 717, 722 (Pa. Super. 2009) (quoting *Abbott v. Schnader, Harrison, Segal & Lewis, LLP*, 2002 PA Super 247, 805 A.2d 547, 553 (Pa. Super. 2002) (internal citations omitted)). "The task of interpreting a contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument." *Maguire v. Ohio Casualty Ins. Co.*, 412 Pa. Super. 59, 602 A.2d 893, 894 (Pa. Super. 1992).

*Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509-510 (Pa. Super. 2013). "Where the language of the contract is ambiguous, the provision is to be construed against the drafter." *State Farm Fire and Casualty Company v. PECO*, 54 A.3d 921, 928 (Pa. Super. 2012); *see also Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983).

Here, Section 2.3.2(b) of Loan Agreement provides, in pertinent part, as follows:

2.3.2 **Payment on Maturity Date**.

. . . .

(b) Borrower will have one (1) option to extend the Maturity Date of the Loan for a consecutive one (1) year period. In order to exercise such extension right, Borrower shall delivered to Lender written notice of such extension on or before May 1, 2008 and, upon giving of such notice of extension, and subject to the satisfaction of the conditions set forth below in this Section 2.3.2.(b) on or before July 9, 2008, the Maturity Date as theretofore in effect will be extended to July 9, 2009. The Maturity Date shall be extended pursuant to Borrower's notice as aforesaid, provided that the following conditions are satisfied: (i) no Event of Default shall be in existence either at the time of the Borrower's notice or at the then-current Maturity Date, (ii) Borrower shall enter into an Interest Rate Protection Agreement through the term of the extension under the same terms and conditions of the initial Interest Rate Protection Agreement (including its LIBOR strike price) entered into in connection with the Loan and shall provide an Assignment of Protection Agreement, together with an opinion of counsel with respect thereto reasonably acceptable to Lender, (iii) the **Debt Service Coverage Ratio for the Property shall not be less than 1.05 to 1.0** and (iv) either (x) the Interest Shortfall Reserve is adequately funded as reasonably determined by Lender or (y) the Net Cash Flow as calculated by Lender is at least $8,200,000.00.

Loan Agreement, 6/18/2007, at 23-24 (some emphasis added and some emphasis omitted).

DSCR is defined as the following:

"**Debt Service Coverage Ratio**" shall mean a ratio for the applicable period in which:

    (i)    the numerator is the Net Cash Flow for such period as set forth in the financial statements required in accordance with this Agreement; and

    (ii)    the denominator is the aggregate amount of principal and interest due and payable on the Loan and the Mezzanine Loan, if applicable.

*Id.* at 5.

The Loan Agreement also provides, that the "'**DSCR Trigger Event**' shall mean, that as of any Debt Service Coverage Ratio Determination Date, the Debt Service Coverage Ratio based on the trailing six (6) month period (annualized) immediately preceding the date of such determination is less than 1.00 to 1.00." *Id.* at 6.

"'Net Cash Flow" is defined as: "[F]or any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period." *Id.* at 13. Finally, the Loan Agreement defined "operating expenses" as follows:

[F]or any period, the total of all expenditures, computed in accordance with GAAP, of whatever kind during such period relating to the operating, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and

assessments, advertising expenses, management fees, payroll and related taxes, computer processing charges, tenant improvements and leasing commissions (which tenant improvements and leasing commissions for the purposes of this definition shall be calculated based upon an amount no greater than the actual or assumed expense of $97,000.00 per month), operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenditures, and contributions to the Capital Expenditure Funds, the Tax Funds, Insurance Funds, the Rollover Funds and any other reserves required under the Loan Documents.

*Id.*

Additionally, pursuant to Section 4.1.6(b), the Loan Agreement provides the procedure for monthly financial reporting as follows:

Prior to a Securitization, within twenty (20) days after the end of each calendar month, Borrower shall furnish to Lender a current (as of the calendar month just ended) balance sheet, a detailed operating statement (showing monthly activity and year-to-date) stating Gross Income from Operations, Operating Expenses, and Net Cash Flow for the calendar month just ended, a general ledger, a rent roll for the subject month and, as requested by Lender, a written statement setting forth any variance from the Annual Budget and other documentation supporting the information disclosed in the most recent financial statements. In addition, such statement shall also be accompanied by (i) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such month for such month and (ii) a certificate of the chief financial officer of Borrower or the general partner of Borrower stating that the representations and warranties of Borrower set forth in Section 3.1.24 are true and correct as of the date of such certificate and that there are no trade payables outstanding for more than sixty (60) days.

*Id.* at 43 (emphasis in original).

In Goodman's November 2, 2011, Report, he made the following observations and conclusions:

[W]e have calculated the DSCR, at the time of the sale of the Girard Square properties, at 1.54 to 1, which would have met the requirement for extending the loan. As mentioned previously, when calculating net operating income, **forward-looking rental revenue and prior period expenses should be used**. **The net operating income used in the DSCR calculation includes the estimated $1.7 million in increased rental revenue**. For illustration purposes, we also calculated the DSCR in accordance with the June 18, 2007 loan agreement, which includes debt service on the mezzanine loan. We based the mezzanine loan debt service on a $7.5 million loan with 16% interest. Under the June 18, 2007 loan agreement, Girard Square would have also met the required DSCR, at 1.24 to 1 [with the mezzanine loan].

. . . .

Based upon the documents considered and analysis performed, we concluded that:

- TCA's inability to access funds in the interest shortfall account caused operating deficits, resulting in large accounts payable balances.

- Had the loan and cash management agreements been drafted in accordance with TCA's expectations, and TCA been able to draw on the interest shortfall reserve, accounts payable, at the time the properties were sold, would have been reduced to just those classified as current and there would be funds remaining in the interest shortfall reserve.

- Had the option to extend not been revoked in the December 14, 2007 Amended Loan Agreement, TCA would have qualified for the additional one year loan extension.

Goodman Report, 11/2/2011, at 10-11 (emphasis added).

On January 17, 2012, Goodman expounded upon his calculations in a supplemental report, which stated in relevant part:

- In our initial analysis of the internally prepared financials for the first half of 2008, we identified several items we believe

would have required adjustment to reflect a complete and accurate profit and loss statement for the six months January 2008 to June 2008. We made inquiries of [TCA] to assist us in understanding the treatment and classification of select revenue and expense transactions. Additionally, TCA provided select information to assist us in the projecting of revenues and expenses for the second half of 2008. Together, **the revised first half actual and second half projected results will be referred to as 2008 projected net operating income**.

. . . .

Calculation of Projected Operating Revenue for the Year Ended December 31, 2008

Girard Square's internally prepared financial statements reflect total operating revenues of $5,798,040.87 for the first half of 2008.

Based on the assumption that Girard Square would have remained a viable entity we made several adjustments to reflect increased operating revenues through June 30, 2008 and projected operating revenues from July 1, 2008 to December 31, 2008 that we believe would have occurred had the property not been sold.

• Garage and parking rent for May and June was not recorded to the general ledger for Girard Square. We reviewed the first four 2008 monthly amounts posted to the general ledger for garage and parking rent and calculated average monthly revenue of $95,000. **Based on projected increased activity, we adjusted the monthly revenue to $100,000.** We used this amount per month for May and June 2008 and factored it into our forward looking projections.

• **During June 2008, $309,290.71 in rental income from TCA was written off. This was rental income that was accrued for space rented by TCA for management offices.** A review of Girard Square's general ledger showed that the TCA rent was posted to rental income every month since the purchase of the property. The write-off agrees to all amounts posted to

the general ledger from July 2007 through June 2008. Had TCA remained the owner of Girard Square, those amounts would have remained as rental income.

**After adjusting for the additions of garage and parking revenues and June 2008 TCA rent write-off add back, the first half 2008 revenues would have totaled $6,337,031.58**.

To determine the projected 2008 revenues, first half adjusted revenues were doubled to $12,674,063.16.

**An adjustment to second half 2008 projected revenues was required to account for new leases entered into after January 1, 2008 and rents scheduled to increase after January 1, 2008**.  In those cases, the doubling of rents does not fully account for these new rents or rent increases when projecting the second half of 2008.  **Our analysis shows that $531,680.31 in additional revenue would have been received in the second half of 2008 when compared to the first half of 2008**.  These increases include approximately $464,000 in second half 2008 revenues from the tenants Family and Municipal Court.

When the new lease and increased rent adjustment is added to the doubled revenues, it results in projected 2008 revenues of $13,205,743.47.

This projection does not consider any additional income that might have been realized from any new leases that could have been signed in the second half of 2008 had Girard Square remained owned by TCA.

Calculation of Projected Operating Expenses for the Year Ended December 31, 2008

Girard Square's internally prepared financial statements reflect total operating expenses of $3,310,203.88 for the first half of 2008.

Based on the assumption that Girard Square would have remained owned by TCA, we made several adjustments to reflect adjusted operating expenses through June 30, 2008 and projected operating expenses from July 1, 2008 to December 31,

2008 that we believe would have occurred had the property not been sold.

. . . .

The net changes to actual operating expenses for the first half of 2008 result in an expense reduction of $90,102.65. This change causes operating expenses from the internally prepared profit and loss statements to reduce from $3,310,203.88 to $3,220,101.23.

The projection of operating expenses for 2008 for Girard Square uses the adjusted expenses of $3,220,101.23 and doubles them to $6,440,202.46.

. . . .

Calculation of Projected Debt Service Expense for the Year Ended December 31, 2008

For purposes of determining the debt service amount to use in the DSCR, interest expense is calculated using the LIBOR rate at July 2008 (the expected renewal date), 2.46%, plus a spread of 2.25%, for a total of 4.71%. The LIBOR rate of 2.46% would have had to have been capped using a swap agreement until July 2009, at which point, the LIBOR rate had decreased by approximately 88% to 0.2907%.

The mezzanine loan carried interest at 16% annually. For both the loan and mezzanine loan, the amount of debt service used in the DSCR is one year of interest-only payments from July 2008 through June 2009.

Goodman's Supplemental Report, 1/27/2012, at 2-4 (emphasis added).

Moreover, Goodman again stated that the DSCR requirement would have been met, when debt service payments are calculated, including and excluding mezzanine loan payments, with a ratio of 1.33 to 1.07. *Id.* at 4-5.

Here, the trial court determined that contrary to Goodman's calculations, the Loan Agreement "specifically requires the monitoring of DSCR based on historical financials, not forward looking projections." Trial Court Opinion, 7/10/2013, at 7. Additionally, it found the following:

Goodman's projection of net operating income from July 2008 through December 2008 ignored the clear language of the Loan Agreement. Under Pennsylvania law, there must be some factual predicate for the expert opinion identified on the record. An expert may not express his opinion upon facts which are not warranted in the record, regardless of the expert's skill and experience. Where an expert's opinion is based on an assumption that is contrary to the established facts of record, that opinion is worthless.

In *Commonwealth v. Rounds*, 518 Pa. 204, 209; 542 A.2d 997, 999 (Pa. 2005), the Pennsylvania Supreme Court explained the reasons why the conclusions of an expert must be based upon facts found in the record. The Court stated:

expert opinion testimony is proper if the facts upon which it is based are of record…. An expert's function is to assist the jury in understanding the problem so that the jury can make the ultimate determination. If a jury disbelieves the facts upon which the opinion is based, the jury undoubtedly will disregard the expert's opinion. Likewise, if a jury accepts the veracity of the facts which the expert relies upon, it is more likely that the jury will accept the expert's opinion. At the heart of any analysis is the veracity of the facts upon which the conclusion is based. Without the facts, a jury cannot make any determination as to validity of the expert's opinion. To hold otherwise would result in a total and complete usurpation of the jury's function in our system of justice.

The Loan Agreement is clear. Where the words of the contract are clear and unambiguous, the intent of the parties must be determined exclusively from the agreement itself. Goodman's projection of operating expenses to determine the DSCR was contrary to the facts of the record and the clear language of the Loan Agreement[.]

*Id.* at 8-9 (footnotes omitted).

While we agree with TCA that the language in the Loan Agreement does not explicitly provide how the DSCR is to be calculated under Section 2.3.2(b), we find the trial court acted properly in determining: (1) the Loan Agreement requires the monitoring of DSCR based on historical financials; (2) Goodman's projection of net operating income from July 2008 through December 2008 ignored the plain language of the Loan Agreement; and (3) Goodman's expert report was not substantiated by some factual predicate as identified in the record.

With respect to interpreting the meaning of a contract, we note that the "whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." ***Murphy v. Duquesne Univ. of the Holy Ghost***, 777 A.2d 418, 429 (Pa. 2001).

> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Id.* at 429-430 (citations and quotation marks omitted).

- 29 -

Here, in viewing the contract as a whole, it is evident that the DSCR is based on the use of historical financial data where the language of the Loan Agreement provides that: (1) the numerator of the DSCR is the "Net Cash Flow **for such period as set forth in the financial statements**;" (2) the denominator of the DSCR is "the **aggregate amount of principal and interest due and payable** on the Loan and the Mezzanine Loan;" (3) the Operating Expenses, which are part of the Net Cash Flow amount, are based on "the total of all expenditures … during such period relating to the operation, maintenance and management of the Property **that are incurred on a regular monthly or other periodic basis**;" and (4) the monthly financial report must include a "**calculation reflecting the [DSCR] as of the last day of such month for such month**." *See* Loan Agreement, 6/18/2007, at 5, 13, 43.

Moreover, the term, "annualized," is generally based on historical financial information. *See Merriam-Webster*, *supra*. With respect to the Loan Agreement, it bears remarking that the term is only set forth in the definition of the DSCR Trigger Event. That section provides that as of any DSCR Determination date, the DSCR is "based on the trailing six (6) month period (annualized) immediately preceding the date of such determination[.]." *Id.* at 6. Section 2.3.2(b) and the definition of DSCR do not refer to the use of "annualized" figures in the calculations. The definition of DSCR, and consequently Section 2.3.2(b), **does refer** to the "Net Cash

Flow," as set forth in the financial statements, which is based on historical calculations. Goodman's use of forward-looking revenue in calculating the net operating income ignored this language of the Loan Agreement.

Furthermore, as indicated by the trial court, it was demonstrated that the figures used by Goodman in his reporting were not supported by the record.[10] For example, Goodman adjusted the calculation for the projected operating revenue by adding (and then doubling) $309,290.71, which had been written off because it was space rented by TCA for management offices.[11] As noted by ML&B in its brief,[12] given that TCA's affiliate office never paid for this rent space, there was no justification for including this number in the DSCR calculation because TCA had not accrued any payment.[13] Likewise, TCA did not provide any proof that this amount would ever be collectable.

---

[10] We note the purpose of expert testimony is "to assist the trier of the facts in understanding complicated matters." ***Panitz v. Behrend***, 632 A.2d 562, 565 (Pa. Super. 1993); ***see also*** Pa.R.E. 702 (testimony by experts). Under Pennsylvania Rule of Evidence 705, "the expert must testify as to the facts or data on which the opinion or inference is based." Pa.R.E. 705.

[11] ***See*** Goodman's Supplemental Report, 1/17/2012, at 2.

[12] ***See*** ML&B's Brief at 20-21.

[13] At the December 13, 2012, hearing, the trial court noted its concern in including this number, stating: "There is one other one there, this accrued rent from TCA. I have a really, really hard time counting that as income when they haven't paid any income." N.T., 12/13/2012, at 28.

Moreover, although Goodman opined the revenues from "new rents or rent increases" would have increased by $531,680.31 for the projected second half of 2008,[14] Goodman based his rent calculation on a forward-looking standard instead of applying the historical data. He stated that an adjustment was required to account for new leases entered into after and for rents scheduled to increase, and that "the doubling of rents does not fully account for these new rents or rent increases." Goodman's Supplemental Report, 1/17/2012, at 2. Therefore, Goodman opined that the $531,680.31 amount "in additional revenue" would have been received in second half of 2008 as compared to the first half of 2008. Goodman's opinion is contrary to the language of the Loan Agreement and there was no factual support with respect to his calculation.[15]

Lastly, in calculating the DSCR, Goodman used the year ending in December 31, 2008 for the applicable period of the numerator but chose the period July 2008 through June 2009 for the denominator.[16] However, the

---

[14] **See** Goodman's Supplemental Report, 1/17/2012, at 2.

[15] Moreover, the record indicated that there was a projected increase in vacancy rates at Girard Square based on the 2007 and 2008 Girard Square rent revenue. **See** ML&B's Motion in *Limine* to Exclude the Testimony of Lawrence M. Goodman, 10/12/2012, at 19-20, Exhibits D & E.

[16] **See** Goodman's Supplemental Report, 1/17/2012, at 1 ("The DSCR ratio shall be calculated using net operating income for the year ended December 31, 2008 based on actual results for the months January 2008 through June 2008, and projected results from July 2008 through December 2008."), at 4 *(Footnote Continued Next Page)*

definition of the DSCR provides that both the numerator and denominator are prefaced with the language, "shall mean a ratio for the applicable period," meaning that **the same period should be used for both calculations**. Loan Agreement, 6/18/2007, at 5. Accordingly, we conclude the trial court properly found that Goodman's report was not supported by the record.

TCA's reliance on ***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1161 (Pa. 2010), and similar cases, for the proposition that the trial court interfered with the province of the jury's role as fact-finder is misplaced. In ***Summers***, the Pennsylvania Supreme Court noted:

> At the summary judgment stage, a trial court is required to take all facts of record, and all reasonable inferences therefrom, in a light most favorable to the non-moving party. This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, **so long as the conclusions contained within those reports are sufficiently supported**, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the trial judge must defer to those conclusions, … and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact.

***Summers***, 997 A.2d at 1161 (citations omitted). Here, as stated above, the underlying facts that formed the foundation of Goodman's expert opinion were not sufficiently supported by the record. Therefore, we conclude the

*(Footnote Continued)* ————————

("For both the loan and mezzanine loan, the amount of debt service used in the DSCR is one year of interest-only payments from July 2008 through June 2009.").

trial court did not abuse its discretion in granting ML&B's motion in *limine* to exclude Goodman's testimony.

Furthermore, because this matter was disposed of at the summary judgment point in proceedings and TCA argues ML&B committed legal malpractice, we are compelled to discuss Goodman's opinion that had ML&B properly advised TCA, (1) TCA would have been able to access "at its discretion"[17] the Interest Shortfall Reserve Fund from the outset, (2) there would have been ample cash available to pay all of the Girard Square operating expenses, and (3) TCA would not have been forced to bargain away its one-year renewal right, as per Section 2.3.2(b), to gain access to operating funds. Moreover, Goodman stated: "[H]ad Girard Square's access to the reserve during 2007-2008 been according to management's requirements, it would likely have been in a stronger position, if needed, to manage payables, contribute capital, or obtain outside investment to fund the Interest Shortfall Reserve to ensure it was at a level acceptable to UBS." Goodman Report, 11/2/2011, at 10.

Goodman's opinion is speculative for several reasons. His opinion ignores the fact that whether or not TCA had access to the Interest Shortfall Reserve Fund, TCA must demonstrate that it still would have met the DSCR for the one-year extension option. However, as analyzed above, Goodman's

_____

[17] Goodman Report, 11/2/2011, at 6.

DSCR calculation was not supported by the record. As such, TCA did not demonstrate it would have qualified for the one-year renewal option based on the state of TCA's incoming revenue at that time.

Moreover, the evidence does not support a conclusion that UBS would have accepted TCA's terms and allowed TCA "at its discretion" to access the Interest Shortfall Reserve Fund. While TCA claims that UBS was willing to give it more favorable terms because UBS had renegotiated and amended the Loan Agreement,[18] this argument ignores the fact that when TCA and UBS originally negotiated, TCA could not access the reserve fund unless it had zero dollars to pay for operating expenses, and when TCA and UBS renegotiated the loan terms in December 2007, TCA received access to the reserve fund, permitting it to draw up to $1,050,000 for the payment of utilities and payroll, **but** TCA had to relinquish the one-year renewal option. One can reasonably infer that UBS would not have allowed TCA both discretionary access to the reserve fund and the one-year renewal option.

Lastly, with respect to Goodman's opinion that having access to the reserve would likely have put TCA in a stronger position to manage payables, contribute capital, and obtain outside investment is too speculative because he again fails to provide any evidentiary support with respect to this assumption.

---

[18] **See** TCA's Memorandum of Law in Opposition to ML&B's Motion for Summary Judgment, 2/9/2012 at 46-47.

Consequently, TCA failed to demonstrate ML&B's actions deprived TCA of access to funds necessary to operate Girard Square, thereby forcing TCA to give up its loan-renewal right as well as the property altogether. Accordingly, TCA failed to prove that ML&B's conduct was the proximate cause of its damages. *Boyer*, 714 A.2d at 462. Therefore, we conclude the trial court did not err or abuse its discretion in granting ML&B's motion for summary judgment as a result of TCA's failure to demonstrate damages based on its legal malpractice claim.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/18/2014